## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HAMPSHIRE GROUP, LIMITED, et al., | Case No. 16-12634 (BLS) |
| Debtors.[1] | Joint Administration Requested |

**MOTION OF DEBTORS FOR ENTRY OF ORDERS (I) (A) APPROVING BID PROCEDURES FOR THE DEBTOR'S JAMES CAMPBELL ASSETS; (B) APPROVING NOTICE PROCEDURES FOR THE SOLICITATION OF BIDS, AN AUCTION, AND THE ASSUMPTION AND ASSIGNMENT OF ANY EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH; AND (C) SCHEDULING AN AUCTION FOR THE SALE OF THE JAMES CAMPBELL ASSETS; (II) APPROVING THE SALE OF THE JAMES CAMPBELL ASSETS AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF ANY EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH; AND (III) GRANTING RELATED RELIEF**

The debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases (the Cases") hereby move the Court (the "Motion") for entry of (A) an order pursuant to sections 105(a), 363(b), and/or 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rules 6004 and/or 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), substantially in the form annexed as **Exhibit A** hereto, (i) approving bid procedures; (ii) approving the form and manner of notice of the sale of the Debtor Hampshire Group, Limited's James Campbell Assets (as defined below); (iii) approving the form and manner of notice of assumption and assignment, including cure amounts, of any executory contracts and unexpired leases in connection therewith; (iv) establishing a date for an auction; (v) establishing a date for a sale hearing; and (vi) granting related relief; and (B) an

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Hampshire Group, Limited (7107), Hampshire Brands, Inc. f/k/a Hampshire Designers, Inc. (1174) and Hampshire International, LLC (5327). The address of the Debtors' corporate headquarters is 1924 Pearman Dairy Road, Anderson, South Carolina 29625.

order substantially in the form annexed as **Exhibit E** hereto: (i) approving the sale of the James Campbell Assets pursuant to the terms of an asset purchase agreement substantially in the form attached hereto as **Exhibit B** (the "Purchase Agreement") that would be executed by the Debtor and the successful bidder (the "Purchaser") in connection therewith; (ii) approving the sale and/or assumption and assignment of any executory contracts and unexpired leases in connection therewith, and (iii) granting related relief.   In further support of the Motion, the Debtors respectfully state as follows:

### JURISDICTION

1.      This Court has jurisdiction over these Cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.   This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).   Venue is proper under 28 U.S.C. §§ 1408 and 1409.

2.      Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.      The statutory and legal predicates for the relief requested herein are sections 105(a), 363 and/or 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and/or 9014, and/or Local Rule 6004-1.

## BACKGROUND

4.      On November 23, 2016 (the "Petition Date"), each of the Debtors commenced in this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

5.      Each Debtor operates its businesses and manages its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   The Court has entered an order providing for joint administration of these chapter 11 cases (the "Cases") for procedural purposes.

6.      On December 7, 2016, the Office of the United States Trustee (the "OUST") appointed an official committee of unsecured creditors (the "Creditors' Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code.

7.      No trustee or examiner has been appointed in these Cases to date.

8.      Factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading up to the filing of these Cases is set forth in the *Declaration of William Drozdowski in Support of Chapter 11 Petitions and Various First Day Motions* [Docket No. 12] (the "First Day Declaration"), incorporated herein by reference.

9.      As described in the First Day Declaration, these Cases were filed on an emergency basis in response to certain efforts taken by an unsecured creditor (Onewoo Corporation) in the litigation styled *Onewoo Corp., et al. v. Hampshire Brands, Inc., et al.*, Case No. 1:16-CV-4623 (PKC) (S.D.N.Y.) (the "Onewoo Litigation").   In the Onewoo Litigation, Onewoo was able to obtain a prejudgment order of attachment against the assets of Debtors Hampshire Group, Limited ("HGL") and Hampshire Brands, Inc. ("HBI").

10.     Since June 2016, in an effort to maximize value for the benefit of stakeholders, the Debtors have been engaged in an out-of-court orderly liquidation and wind-down of their licensed businesses.  Creditors and stockholders were informed of this effort.

11.     These Cases were filed to stop the litigation and collection efforts of a single creditor (Onewoo) and to preserve and maximize the value of the Debtors' assets and bankruptcy estates, for the benefit of all creditors.

12.     The Debtors are providers of fashion apparel across a broad range of product categories, channels of distribution, and price points.  They specialize in designing and marketing men's sportswear to department stores, chain stores, and mass market retailers under licensed brands and their own proprietary brands.  Brands manufactured and sold pursuant to license and other agreements have included Dockers® and James Campbell®.  The Debtors' website can be found at www.hamp.com.

13.     Primary customers include JC Penney, Kohl's, Sears, Burlington Stores, and Nordstrom, among others.

**The Debtors' Prepetition Secured Credit Facility and Postpetition Use of Cash Collateral**

14.     The Debtors, as well as two non-debtor affiliates at that time (Scott James, LLC and Rio Garment S.A.), as borrowers, the lenders party thereto, and Salus Capital Partners, LLC ("Salus") as administrative agent and collateral agent (together with the other lenders party to the Prepetition Credit Agreement (as defined below), the "Prepetition Secured Parties"), are parties to that certain Credit Agreement, dated as of September 26, 2013 (as such may have been amended, restated, supplemented, extended, or otherwise modified from time to time, the "Prepetition Credit Agreement").

15.     The Prepetition Credit Agreement provides for the making of revolving loans and term loans to the borrowers as provided therein.  The Debtors believe that the Prepetition Secured Parties have perfected liens on all or substantially all of the assets of the Debtors, including the James Campbell Assets.

16.     Pursuant to the terms of the interim cash collateral order entered by this Court on December 22, 2016 [Dkt. No. 36], the Debtors obtained the consensual use of cash collateral. Among other things, the Debtors have the right and current financial wherewithal to continue to maintain their assets and operate their business, including without limitation the James Campbell business.

17.     Since the Petition Date, the Debtors have continued to sell inventory and collect on outstanding accounts receivable.  As monies are collected by the Debtors, and after a sufficient amount of cash is maintained to pay for expenses incurred in these Cases, the Debtors have been making repayments to Salus to reduce the balance of the secured debt owed to the Prepetition Secured Parties.

18.     As of the filing of this Motion, Salus is owed approximately $2.7 million, down from approximately $7.4 million owed as of the Petition Date.  Once the allowed claims of Salus are paid in full, additional monies collected by the Debtors and not spent on items such as chapter 11 administrative expenses are expected to be available for distribution on a pro rata basis to prepetition priority and nonpriority unsecured creditors.

**The Proposed Sale of the Debtor's James Campbell Assets**

19.     Debtor HGL entered into the following agreements, each dated as of February 19, 2014:

(a)     Debtor HGL, as buyer, and Maverick J, LLC ("Maverick J") and Maverick J, SPE, LLC ("Maverick SPE"), as sellers[2], entered into an Installment Purchase and Sale Agreement in connection with HGL's purchase of assets relating to the James Campbell Brand (as that term is defined in the Installment Purchase and Sale Agreement).[3]   The Installment Purchase and Sale Agreement called for installment payments aggregating $1,250,000, plus the assumption of certain liabilities, plus the payment of Excess Payments (as that term is defined in the Installment Purchase and Sale Agreement) equal to five percent (5%) of annual Net Sales (as that term is defined in the Installment Purchase and Sale Agreement) in excess of $5,000,000 commencing on December 31, 2013 and ending on December 31, 2018, until such time when Maverick J has received an aggregate of $2,500,000 in purchase price, at which time, the percentage of Net Sales to be paid on Excess Payments shall be reduced to 2.5%.   Once HGL had paid an aggregate of $1,250,000 in purchase consideration, title to the James Campbell Brand was to be conveyed to HGL.   Strictly as a matter of security for Maverick J, in the event that HGL's Net Worth (as that term is defined in the Installment Purchase and Sale Agreement) was less than $1,250,000 at the time title to the James Campbell

---

[2] Richard Solomon, an individual, and his company, Rick Solomon Enterprises, Inc., also were signatories to the Installment Purchase and Sale Agreement for purposes of certain provisions of that agreement.   At least as of February 19, 2014, the Debtors understood Maverick J to be the sole member of Maverick SPE, and Rick Solomon Enterprises, Inc. to be the sole member of Maverick J.   Collectively, Maverick J, Maverick SPE, Rick Solomon Enterprises, Inc., and Richard Solomon shall be referred to in this Motion as the "Maverick Parties".

The Debtors understand the Polsinelli law firm represents both the Maverick Parties and Onewoo in these Cases.   In addition to having filed and pursued the Onewoo Litigation, Onewoo also is a current member of the Creditors' Committee.   The Debtors have informed Creditors' Committee counsel and Polsinelli attorneys of the Debtors' concerns relating to this conflict of interest.   The Debtors have received assurances from Creditors' Committee counsel and Polsinelli that (i) Polsinelli attorneys on behalf of Onewoo will not participate in or be privy to any Creditors' Committee deliberations relating to James Campbell matters and (ii) Polsinelli has established an ethical wall whereby certain Polsinelli attorneys working on the Maverick Parties' representation will be walled off from Polsinelli attorneys representing Onewoo, and that confidential information relating to these Cases will neither be shared among nor disclosed between attorneys on opposite sides of the Polsinelli ethical wall.

[3] The term "James Campbell Assets", as used in this Motion, shall include all of the "Acquired Assets," as that term is defined in the Purchase Agreement, as well as the "Customer Purchase Orders," as that term is defined in the Purchase Agreement.

Brand was otherwise required to be conveyed to HGL, the parties had agreed that the license arrangement for the James Campbell Brand (documented by the Master License Agreement, described below) would survive until the later of (a) HGL's Net Worth exceeding $1,250,000 or (b) December 31, 2018. To date, HGL has paid all required amounts to Maverick J. The Debtors further note that the Excess Payments are fashioned as additional purchase price consideration and not as ongoing royalties in consideration for the Master License Agreement. The Master License Agreement is an instrument of collateral for the benefit of Maverick J.

(b)      HGL, as Licensee, and Maverick SPE, as Licensor, entered into a Master License Agreement "providing for the licensing of the James Campbell Brand (as defined below) from Licensor to Licensee until a designated point set forth in the Purchase Agreement upon which title to such marks transfers from Licensor to Licensee in accordance with the Purchase Agreement and this Agreement." (Master License Agreement, First WHEREAS clause). The rights conferred under the Master License Agreement are companion rights to those set forth in the Installment Purchase and Sale Agreement. There is no royalty due pursuant to the terms of the license, as the Master License Agreement states that "all consideration will be tendered pursuant to the Purchase Agreement". (Master License Agreement, Section 6). As intended by the parties, Debtor HGL has been operating as the de facto owner of the James Campbell Brand since the February 2014 transaction. The Maverick Parties have attempted to retain an ownership interest in the James Campbell Brand merely as collateral security for the payment of the Excess Payment obligations under the Installment Purchase and Sale Agreement.

(c)      Maverick J, as grantor and pledgor, and HGL, as Secured Party, entered into a Pledge and Security Agreement whereby, "in order to induce [HGL] to enter into the

[Installment Purchase and Sale Agreement] and that certain [Master License Agreement]",
Maverick J agreed to grant to HGL "a continuing security interest in and to the Collateral (as
defined below) in order to secure the prompt and complete payment, observance and
performance of the Obligations (as defined in Section 3 below)".  (Pledge and Security
Agreement, Third WHEREAS clause)  The "Collateral" referred to in the immediately
preceding sentence is defined in the Pledge and Security Agreement as the "Pledged Interests
and all proceeds thereof." (Pledge and Security Agreement, §2).  The Pledged Interests are all
of Maverick J's equity interests in Maverick SPE. (Pledge and Security Agreement, §§1(d), 2).[4]

(d)    Maverick SPE, as grantor, and HGL as purchaser, entered into a
Trademark Security Agreement, pursuant to which Maverick SPE agreed, so as to "secure the
complete and timely payment and satisfaction of the Obligations," to grant to HGL, "a lien on,
and security interest in, its entire right, title and interest in and to the James Campbell
Brand…".  (Trademark Security Agreement, §1).  In the Trademark Security Agreement, the
"James Campbell Brand," is defined to include "the Trademarks, Brands, Names and IP Rights
and the registration thereof, together with all of the goodwill of Grantor associated therewith
and represented thereby, as security for all of Seller's obligations to Purchaser under the
Purchase Agreement and the Master License Agreement (collectively, the "Obligations")."
(Trademark Security Agreement, ¶D)  Moreover, in the Trademark Security Agreement, it was
acknowledged that "[I]n connection with the Purchase Agreement and the Master License
Agreement, [Maverick J] has contributed the James Campbell Brand to the Grantor, and
pursuant to the Master License Agreement, the Grantor shall grant to the Purchaser exclusive

---

[4] Additional agreements executed among the foregoing parties, as of February 19, 2014, included: (i) that certain Bill of Sale and Assignment between Maverick J and Maverick SPE as sellers and HGL as buyer; (ii) a certain Letter Agreement Regarding Excess Inventory between HGL, Maverick J, Rick Solomon Enterprises, Inc.,

rights with respect to the James Campbell Brand as set forth therein." (Trademark Security Agreement, ¶C).

20.      The foregoing Installment Purchase and Sale Agreement, the Master License Agreement, the Pledge and Security Agreement, and the Trademark Security Agreement shall be referred to herein as the Assigned Maverick Contracts.  The Assigned Maverick Contracts are included within the term "Assigned Contracts" as that term is used in the form of Purchase Agreement attached hereto as **Exhibit B**.

21.      Since February 2014, the Debtors have met all of their obligations under the Assigned Maverick Contracts.  If it is determined the Assigned Maverick Contracts must be assumed and assigned pursuant to section 365 of the Bankruptcy Code in connection with approval of the proposed sale of the James Campbell Assets, the Debtors do not believe any cure amount is owed to any of the Maverick Parties pursuant to section 365(b)(1) of the Bankruptcy Code.  Moreover, the Debtors do not believe any cure amounts are owed in respect of an assumption and assignment of any other Assigned Contract.

22.      Since February 2014, the Debtors have marketed and developed the James

Campbell Brand and operated their James Campbell business.  In calendar year 2016, the Debtors have sold approximately 275,000 units of James Campbell clothing, resulting in revenue of approximately $4.75 million.

23.      As of January 2017, three full-time employees, 2 independent contractors, and 2 commissioned salespersons perform duties relating to the Debtors' James Campbell business. The Debtors estimate that approximately $135,000 in monthly costs currently are attributable to operation of the James Campbell business, exclusive of any monies that would be used to

---

and Richard Solomon; (iii) an Assignment and Assumption Agreement between HGL as assignee and Maverick J and Maverick SPE as assignors;  and (iv) a Limited Guaranty by Richard Solomon in favor of HGL.

purchase additional James Campbell units.  These business and operational costs are expected to be assumed by the Purchaser pursuant to the terms of the Purchase Agreement upon a Closing of the proposed transaction.

24.    As of the Petition Date, approximately 105,000 units of James Campbell clothing (the "James Campbell WIP Units") were in various stages of manufacture by multiple vendors located in China, Vietnam, and India.

25.    The James Campbell WIP Units were ordered by the Debtors prepetition to meet customer demand for James Campbell units in advance of the spring 2017 selling season.  The Debtors currently have customer purchase orders in hand for approximately 95% of the James Campbell WIP Units.  These customer purchase orders would be filled by Purchaser pursuant to the terms of the Purchase Agreement upon a timely Closing of the proposed transaction.

26.    The aggregate remaining cost for the Debtors to purchase all of the James Campbell WIP Units and have these units shipped to California is approximately $990,000 (Landed Duty Paid).  The initial sum of approximately $107,000 is due to be paid on or about December 27, 2016; if paid, approximately 13,000 James Campbell WIP Units will be shipped on or about January 30, 2017.  An additional $582,000 is due to be paid for James Campbell WIP Units on or about January 15, 2017; if paid, an additional approximately 57,400 James Campbell WIP Units will be shipped.  Finally, approximately $262,000 is due to be paid on or about March 15, 2017; if paid, the remaining 35,300 James Campbell WIP Units will be shipped.

27.    Pending a Closing of the proposed transaction with a Purchaser, the Debtors can continue to fill customer purchase orders for existing James Campbell units.  And as necessary, the Debtors can fill customer purchase orders for the James Campbell WIP Units, assuming  such units are paid for and received.  But, the goal and intent is to have the Purchaser purchase the

James Campbell Assets and assume the other liabilities and obligations associated with operation of the James Campbell business, including with respect to the James Campbell WIP Units.

28.     While under no legal obligation to do so, and only in light of the relief sought in this Motion and the Debtors' agreement to seek Court approval of the proposed bid procedures and proposed Sale transaction on an expedited basis, Salus has agreed the Debtors can use cash collateral to make the initial payment of $107,000 that is due to be made on or about December 27, 2016, for the James Campbell WIP Units, as well as payment for certain associated freight and other charges that will come due in near term, assuming no Closing has occurred.

29.     The continued payment for and processing of the James Campbell WIP Units so that customer purchase orders can be filled with an uninterrupted flow of goods and customer store shelves can be stocked for the spring 2017 selling season is critical to the continuation of the James Campbell business and maintenance of the value of the James Campbell Assets.  Time is of the essence to enable the Debtors to reach agreement with a Purchaser, close on the proposed Sale transaction, and capture the value of the James Campbell Assets, all for the benefit of creditors and the bankruptcy estates.

**The Debtors' Marketing Efforts With Respect to the James Campbell Assets**

30.      Prior to and since the Petition Date, Paul Buxbaum, chief executive officer of the Debtors and a long-time industry participant, has led the Debtors' focused efforts in contacting persons and entities in the industry regarding their interest in purchasing the James Campbell Assets on an expedited basis.  Multiple parties have signed non-disclosure agreements.

31.     Written materials regarding the James Campbell Assets have been supplied to prospective purchasers that have expressed an interest in consummating a transaction on a very prompt basis, given the exigencies and circumstances presented.   Certain of the prospective

bidders have visited the Debtors' offices in California to perform due diligence with respect to a purchase of the James Campbell Assets. As of the filing of this Motion, the Debtors are in negotiations with multiple parties in connection with their expressed interest in the purchase of the James Campbell Assets.

32.    The Debtors seek to receive binding bids for the James Campbell Assets and to hold an auction should more than one qualified bid be received. The Debtors intend to select the highest and/or best bid received for the James Campbell Assets, following consultation with Salus and the Creditors Committee.

33.    The Debtors have made a reasonable and appropriate business decision to maximize the value of their assets for the benefit of creditors by seeking an immediate and expedited strategic transaction for the James Campbell Assets, pursuant to the terms substantially in the form of the Purchase Agreement, a copy of which is annexed hereto as **Exhibit "B"**.

34.    The Purchase Agreement contemplates the sale of the James Campbell Assets, free and clear of all liens, claims, interests, and encumbrances, on terms that include the following[5]:

    (a)    <u>Acquired Assets</u>: (i) all Seller's right, title and interest in and to the trademarks, service marks, trade names, service names, and any common law rights, set forth on <u>Schedule 1.1(a)</u> (the "<u>Trademarks</u>") together with the goodwill of any business symbolized thereby and all applications, registrations, and renewals related thereto; (ii) all Seller's right, title and interest in and to the contracts set forth on <u>Schedule 1.1(b)</u> (the "<u>Assigned Contracts</u>"); (iii) all Seller's right, title and interest in the inventory set forth on <u>Schedule 1.1(c)</u>, subject to adjustment as provided in Section 5.5 (as adjusted, the "<u>Inventory on Hand</u>"); (iv) all Seller's right, title and interest in the equipment set forth on <u>Schedule 1.1(d)</u>; (v) all Seller's right, title and interest in the customer purchase orders set forth on <u>Schedule 1.1(e)</u> (the "<u>Customer Purchase Orders</u>"); and (vi) all Seller's right, title

---

[5] The following summary is not comprehensive and is provided for convenience only. Defined terms and references to sections and schedules contained in the summary shall have the meanings ascribed to them in the Purchase Agreement. In the event of any inconsistency between the summary and the form of Purchase Agreement that is executed by the Debtor and successful bidder, the latter document shall control. Parties are encouraged to review the current form and final form of Purchase Agreement in its entirety.

and interest in and to the inventory which is the subject of any Vendor Purchase Order (as defined in Section 1.3(c)) for which Seller has paid the purchase price therefor after the date hereof (the "Future Inventory").

(b) Assumed Liabilities: at the Closing, Buyer shall assume, and Buyer hereby agrees to thereafter pay, perform, and discharge when due, only the following liabilities of Seller (the "Assumed Liabilities"): (i) all liabilities of Seller for Transaction Taxes payable in connection with the transactions contemplated by this Agreement, subject to Section 6.1 of this Agreement; (ii) the liabilities and obligations arising on or after the Closing Date, relating solely to or arising out of Buyer's ownership and operation of the Acquired Assets; provided, however, that, except as provided in Section 1.3(c), the Assumed Liabilities shall not include liabilities and obligations arising out of the Seller's ownership of the Acquired Assets prior to the Closing Date; and (iii) all obligations of Seller arising under the Assigned Contracts, the Customer Purchase Orders and the vendor purchase orders set forth on Schedule 1.3(c) (the "Vendor Purchase Orders").

(c) Consideration: The aggregate consideration for the sale and transfer of the Acquired Assets (the "Purchase Price"), will consist of (i) an amount for the Inventory on Hand equal to $[●] multiplied by the number of items of Inventory on Hand as of the Closing Date; (ii) an amount equal to the aggregate purchase price paid by Seller for the Future Inventory; and (iii) an amount as consideration for all other Acquired Assets.

(d) Deposit: all interested bidders will be required to submit a deposit in the amount of $75,000.00 in connection with their bids.  The Deposit made by the successful bidder will be applied (without interest) toward the final Purchase Price.

(e) Closing:  The consummation of the transactions contemplated by the Purchase Agreement shall take place as soon as possible after entry of the Sale Order, but in no event later than three days after entry of the Sale Order.

(f) Employees: On the Closing Date, Buyer shall offer to employ the employees of the Seller listed on Schedule 5.2(c) of the Purchase Agreement.

## RELIEF REQUESTED

35.     By this Motion, the Debtors are requesting entry of certain orders concerning a proposed sale of the James Campbell Assets.  First, the Debtors seek prompt entry of an order approving bid procedures.  A proposed form of bid procedures order (the "Bid Procedures Order") with attached bid procedures (the "Bid Procedures") is attached hereto as **Exhibit A**. This relief requested by the Debtors is intended to provide for an expedited competitive bidding

and auction process with the goal of preserving and maximizing value for the Debtors' estates, creditors and other stakeholders. The proposed Bid Procedures include the following provisions[6]:

(a) Initial Bids must be received by the Bid Deadline of [January 6, 2017] at 5:00 p.m. (prevailing Eastern Time).

(b) An Initial Bid must contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from the Purchase Agreement) (a "Qualified APA") with, at a minimum, the following requirements: (i) having terms and conditions no less favorable to the Debtors than those of the Purchase Agreement; (ii) providing for consideration that is, in Debtors' reasonable business judgment, sufficient to account for the impact of any delay in closing the transaction, assumed liabilities, excluded liabilities, any purchase price adjustments, any arrangements regarding the Debtor's inventory, cure amounts, contracts to be assumed and assigned, closing conditions, certainty of completion and any other relevant factors); (iii) providing for a deposit in the amount of at least $75,000; and (iv) not being subject to any (w) financing contingency, (x) contingency relating to the completion of unperformed due diligence, (y) contingency relating to the approval of the bidder's board of directors or other internal approvals or consents, or (z) any conditions precedent to the bidder's obligation to purchase the Assets other than those included in the Purchase Agreement.

(c) An Initial Bid must be accompanied by evidence satisfactory to the Debtors in their commercially reasonable discretion that the bidder is willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally performing all obligations under its Qualified APA (or its equivalent) in the event it submits a Successful Bid (as defined below) at the Auction.

(d) An Initial Bid must remain open and irrevocable until the earlier of the end of the second business day following the closing of the transaction and fifteen (15) days after entry of a final order approving a definitive agreement providing for the Sale of Assets.

(e) An Initial Bid must state whether the prospective bidder has obtained all necessary approvals and consents.

(f) The Debtors, after consultation with Salus and the Creditors' Committee, reserve their rights to: (i) impose at or before the Auction such other and additional terms and conditions as may be in the interest of the Debtors, their estates and creditors (so long as such terms are not materially inconsistent with the terms of the Bid

---

[6] Potential bidders and parties in interest are encouraged to read the proposed Bid Procedures and Bid Procedures Order in their entireties, copies of which are attached hereto as **Exhibit A**.

Procedures Order or these Bid Procedures); (ii) extend the deadlines set forth in the Bid Procedures Order and/or these Bid Procedures; (iii) adjourn the Auction at or before the Auction; (iv) continue or adjourn the Sale Hearing without further notice by making an announcement in open Court or by the filing of a hearing agenda pursuant to Local Bankruptcy Rule 9029-3; (v) waive the terms and conditions set forth in the Bid Procedures; (vi) withdraw from the Auction some or all of the Assets at any time prior to or during the Auction; and/or (vii) cancel the Auction.

36.     Following completion of the proposed sale process and any auction held in connection therewith, the Debtors intend to request entry of an order (a) approving the sale of the James Campbell Assets to the Successful Bidder, free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests (collectively, the "Liens") (with such Liens attaching to the proceeds of sale in the same order of priority and to the same extent as such Liens were valid, perfected and enforceable prior to entry of the sale order) and (b) authorizing the Debtor HGL to assume and assign any executory contracts and unexpired leases in connection therewith, as deemed necessary or required.

37.     In light of the Debtor's present circumstances with respect to the James Campbell Assets, as described in detail above, entry of the Bid Procedures Order and the Sale Order granting the relief requested herein will inure to the benefit of the Debtors, creditors, and the bankruptcy estates, thereby furthering the purposes of these chapter 11 Cases.

## APPLICABLE LAW

### A.  Entry Of The Bidding Procedures Order Is Necessary And Appropriate Under The Facts And Circumstances Of These Cases.

38.     Section 363(b)(1) of the Bankruptcy Code provides: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."[7]   Generally, to obtain approval of a proposed sale of assets under section 363(b), a

---

[7] Because the Debtors do not sell directly to consumers, the requirements of section 332(b)(1) of the Bankruptcy Code are inapplicable.  See 11 U.S.C. §363(b)(1).

debtor should demonstrate that the proffered purchase price is the highest or best offer under the circumstances of the case. *See e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").[8]

39.    The implementation of competitive bid procedures to facilitate the sale of a debtor's assets outside the ordinary course of business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest or best recovery for a debtor's estate.    Under the circumstances presented, the proposed Bid Procedures and the opportunity for competitive bidding embodied therein are both reasonable and designed to facilitate a competitive bidding process that already has commenced.  All potential and qualified bidders are encouraged to participate and submit competing bids.  If the Debtors receive more than one qualified bid, a competitive auction will be held prior to the Sale Hearing.

40.    The Debtors desire to receive the greatest value possible for the James Campbell Assets.  The Bid Procedures were developed so as to be consistent with the clear need to expedite the sale process but with the object of promoting active bidding that will result in the highest and/or best offer(s) possible.   In addition, the proposed Bid Procedures reflect the Debtors' objective of conducting an Auction in a controlled, but fair and open, manner that promotes maximum interest from financially capable, motivated bidders who are likely to close a transaction(s), while simultaneously discouraging offers from persons the Debtors do not believe are sufficiently capable or likely to actually consummate a transaction in the timeframes required.

---

[8] Section 105(a) of the Bankruptcy Code provides in relevant part: "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

41.     If more than one Qualified Bid is received by the proposed January 6, 2017 Bid Deadline, the Debtors currently propose to hold an auction of the James Campbell Assets on or about **January 9**, **2017 at 10:00 a.m. (Eastern Time)** at the Delaware or Philadelphia offices of Blank Rome LLP, or such other location determined by the Debtors.  At the Auction, the Debtors intend to select the highest and/or best Qualified Bid for the James Campbell Assets.  **ALL BID(S) SHALL BE SUBJECT TO THE APPROVAL OF THE COURT.**

42.     Parties who submit Qualified Bids prior to the Bid Deadline, as well as representatives of Salus, the Creditors' Committee, OUST, and the Debtors, including professionals representing the foregoing, shall be entitled to attend any Auction.  Any creditor of the Debtors that wishes to attend the Auction may do so as long as it provides to undersigned counsel for the Debtors, at least two business days prior to the Auction, a written notice (including the names of its representatives who will attend) of its planned attendance.

43.     During the Auction, bidding with respect to the James Campbell Assets shall begin with the highest Qualified Bid, continue with the first Incremental Bid Amount of $50,000 over and above the previous highest Qualified Bid, and continue thereafter in minimum increments of at least $25,000, unless modified by the Debtors prior to or at the Auction following consultation with Salus and the Creditors' Committee.

44.     All participating bidders will be permitted sufficient time, to be determined by the Debtors in consultation with Salus and the Creditors' Committee, in which to respond to the previous bid made at an Auction.  The Debtors, in consultation with Salus and the Creditors' Committee, shall determine when bidding shall conclude.

45.     The Debtors will have no obligation to accept or submit for Court approval any bid presented prior to or at the Auction.  The Debtors reserve the right to reject any offer at any time prior to entry of an order approving a sale of the James Campbell Assets.

46.     Given the current circumstances of these Cases, the Debtors believe that implementation of a prompt sale process is the best way to maximize the value of the James Campbell Assets.  Prompt entry of the Bid Procedures Order will permit the sale process to begin as expeditiously as possible.

**B.  The Proposed Sale Transaction Should Be Approved Because Sound Business Reasons Exist in Support and Such Transaction Is the Product of the Debtors' Good Faith Exercise of Sound and Reasonable Business Judgment**.

47.     In addition to approval of the proposed Bid Procedures, the Debtors request approval of the proposed Sale pursuant to the terms set forth in the form of Purchase Agreement attached hereto as **Exhibit B**.

48.     Under Delaware law, the business judgment rule operates as a presumption that "directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest." *Continuing Creditors' Comm. of Star Telecomm., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (*quoting Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988)); *see also Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 555 n. 111 (D. Del. 2008).  Thus, this Court should approve the proposed sale if the Debtors demonstrate a sound business reason or justification in support thereof.  *Myers v. Martin* (*In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 179 (D. Del. 1991); *In re Phoenix Steel Corp.,* 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (the elements necessary for approval of a Section 363 are "the proposed sale is fair and equitable, that there is a good

business reason for completing the sale and the transaction is in good faith"); *In re Lionel Corp.,* 722 F.2d 1063, 1070 (2d Cir. 1983).

49.    Here, the proposed Sale easily meets the "sound business reason" test and it is clear the proposed Sale is necessary to preserve the value of the James Campbell Assets.  First, the fairness and reasonableness of the consideration to be paid for the James Campbell Assets by the Purchaser will be demonstrated by continued and additional exposure of the opportunity to the marketplace via the sale process proposed herein, on notice to potential purchasers, creditors, and other parties in interest.  Likewise, the final form of proposed Purchase Agreement will be the product of good faith, arm's length negotiations between the Debtors and the Purchaser. Moreover, the Debtors have insufficient liquidity to continue funding operation of the James Campbell business indefinitely and substantial and necessary outlays of cash are looming in the very near future in order to continue an uninterrupted flow of James Campbell units in response to customer purchase orders, thereby protecting and maintaining the value and viability of the James Campbell business.  The Debtors have been unsuccessful to date in obtaining postpetition financing or further use of cash collateral that would enable the Debtors to continue operating their business over the next several months.  In short, the Debtors believe that an expedited sale of the James Campbell Assets presents the best and only opportunity to preserve and realize value for such assets and to reduce monthly operating expenses, all for the benefit of creditors and the bankruptcy estates.

### C. The Sale of the James Campbell Assets Should Be Approved Free and Clear of Liens Pursuant to Section 363(f) of the Bankruptcy Code.

50.    Pursuant to section 363(f) of the Bankruptcy Code, the Debtors seek authority to sell and transfer the James Campbell Assets to Purchaser free and clear of all Liens, with such Liens to attach to the proceeds of the sale in the same order of priority, and to the same extent as

such Liens were valid, perfected, and/or enforceable immediately prior to the sale, subject to any

rights and defenses of the Debtors and other parties in interest with respect thereto.    Section

363(f) of the Bankruptcy Code is written in the disjunctive and provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

51.    A sale free and clear of Liens is necessary to maximize the value of the James

Campbell Assets.    Any sale subject to Liens undoubtedly would result in a lower purchase price

and be of substantially less benefit to the Debtors' estates.    A sale free and clear of Liens is

particularly appropriate under the circumstances because any Lien that exists immediately prior

to the closing of any sale will attach to the sale proceeds with the same validity, priority, force

and effect as it had at such time, subject to the rights and defenses of the Debtors or any party in

interest.    The Debtors submit that holders of Liens will be adequately protected by the

availability of sale proceeds to satisfy their Liens.    Thus, the proposed sale(s) satisfies section

363(f) of the Bankruptcy Code.    Moreover, any holder of a Lien that receives notice of the

proposed sale and which fails to object should be deemed to consent to the proposed sale,

thereby complying with section 363(f)(2) of the Bankruptcy Code.

52. The Debtors believe that Salus, on behalf of the Prepetition Secured Lenders, will consent to the proposed Sale.

**D. The Court Should Approve The Assumption And Assignment Of Any Executory Contracts.**

53. Under section 365 of the Bankruptcy Code, a debtor may assume, reject, or assume and assign executory contracts and unexpired leases.

54. In accordance with section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See Sharon Steel Corp. v. Nat'l Fuel Gas Dist. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the executory contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (*quoting In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D. N.Y. 1984).

55. Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for a debtor to assume an executory contract or unexpired lease. This subsection provides:

> (b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> > (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
> >
> > (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

56.    With respect to assignment of an executory contract or unexpired lease, Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

57.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 593 (S.D.N.Y. 1992). Adequate assurance does not mean absolute assurance or a guarantee that the assignee will thrive and make all payments required under the subject contract. *See In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D. N.Y. 1985).

58.    Among other things, adequate assurance may be provided by demonstrating the proposed assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

59.     Here, to date, the Debtors have negotiated with current operators in the industry as potential purchasers of the James Campbell Assets.  At or prior to any Sale Hearing, following the conduct of any Auction, the Debtors will be in a position to make available relevant information concerning the Purchaser, its experience in the industry, its financial wherewithal, and its ability to perform under the Assigned Contracts.

60.     To the extent any defaults are determined to exist under any executory contract or unexpired lease that is an Assigned Contract under the terms of the Purchase Agreement, any such default will be cured promptly following a Closing.[9]  The Debtors do not believe any cure amount would be owed in connection with any contract or unexpired lease that is to be transferred and/or assumed and assigned pursuant to the terms of the Purchase Agreement.  That includes the Assigned Maverick Contracts, to the extent such contracts would be determined to be executory contracts under section 365 of the Bankruptcy Code.  The Debtors reserve all rights, claims, objections, arguments, and defenses as to any arguments by the Maverick Parties that their consent is required in connection with any required assumption and assignment of the Assigned Maverick Contracts.

61.     To facilitate the sale and/or assumption and assignment of the Assigned Contracts, the Debtors propose to serve the Cure Amount Notice, in substantially the form attached hereto as **Exhibit C**, upon the counterparties to the Assigned Contracts immediately following entry of the Bid Procedures Order and request that the Court approve the procedure set forth below for fixing any cure amounts owed on the Assigned Contracts.

---

[9]  The Debtors do not admit or concede that any Assigned Contract under the terms of the Purchase Agreement constitutes an executory contract or unexpired lease that must be assumed and assigned pursuant to section 365 of the Bankruptcy Code.  The Debtors reserve all rights, claims, and arguments available at law or equity.

62.     The Debtors will attach to the Cure Amount Notice their calculation of the cure amounts (the "Cure Amounts") the Debtors believe must be paid to cure defaults under the Assigned Contracts.  If the amount listed is zero ($0), the Debtors believe there is no Cure Amount to be paid in connection with assumption and assignment of a particular Assigned Contract.  The Debtors request that any counterparty to an Assigned Contract that wishes to file an objection (the "Cure Amount Objection") to its proposed Cure Amount, or otherwise to the proposed assumption and assignment of the Assigned Contract, must do so (and serve a copy so as to be received by the undersigned counsel for the Debtors) on or before January 9, 2017 at 5:00 p.m. (prevailing Eastern Time).

63.     If no timely Cure Amount Objection is received, the Debtors seek entry of an order providing that the respective contract counterparty (a) be forever barred from objecting to the proposed Cure Amount and from asserting any additional cure or other amounts due with respect to such Assigned Contract; and (b) be deemed to have consented to the assumption and assignment of such Assigned Contract and shall be forever barred and estopped from asserting or claiming against the Debtors or the Purchaser that any additional amounts are due or defaults exist or conditions to assumption and assignment must be satisfied under such Assigned Contract.

64.     If a timely Cure Amount Objection is filed, the Cure Amount Objection must set forth (i) all grounds for the objection and (ii) the amount the contract counterparty asserts to be the correct Cure Amount.  After receipt of a Cure Amount Objection, the Debtors will attempt to reconcile any differences in the Cure Amount. If agreement cannot be reached, the Court will be asked to resolve the disputed issues at the Sale hearing or at a subsequent hearing to be scheduled by the Court.

E.        **Notice of the Proposed Sale Is Reasonable under the Circumstances.**

65.        As noted above, the Debtors are confronted with pressing business and economic circumstances dictating a prompt sale process and sale hearing with respect to the James Campbell Assets.  In order to preserve value and receive the highest and/or best price for the James Campbell Assets, the Debtors are seeking to conduct the Auction and hold the Sale Hearing on an accelerated track.  The Debtors continue to incur costs associated with preserving the value of the James Campbell Assets.  In order to yield the greatest possible return for the benefit of creditors, maintain product flow to customers, and limit potential administrative expenses, the Debtors believe that an expedited auction and sale process is warranted and necessary.

66.        Following entry of the Bid Procedures Order, the Debtors will provide notice of the Bid Procedures Order, the Bid Procedures, the Purchase Agreement, the Cure Amounts and the Cure Amount Objection Deadline, the time and place of the Auction, the Sale Hearing, and the Sale Objection Deadline.  The Debtors propose to send the Notice of Auction and Sale Hearing, substantially in the form attached to this Motion as **Exhibit D**, to (a) taxing authorities or recording offices which have a reasonably known interest in the relief requested; (b) counsel for the OUST; (c) counsel to Salus; (d) counsel to the Creditors' Committee; (e) federal, state, and local regulatory authorities with jurisdiction over the Debtors; (f) the Office of the United States Attorney for the District of Delaware, the United States Securities and Exchange Commission, and the Internal Revenue Service; (g) insurers; (h) contract counterparties with respect to the Assigned Contracts; (i) parties known to have expressed an interest in the James Campbell Assets or to have executed confidentiality agreements in connection therewith; (j) the

Maverick Parties or their known counsel with respect to these matters; (k) known creditors; and (l) parties requesting notices under Bankruptcy Rule 2002.[10]

67.     Accordingly, the Debtors submit that the notice to be provided is reasonable and appropriate and will be adequate under the circumstances to ensure that the value of the James Campbell Assets has been tested in the marketplace and that all interested parties have a reasonable and fair opportunity to participate with respect to the proposed Sale transaction.

**F.      The Automatic Ten Day Stays Under Bankruptcy Rules 6004(g) And 6006(d) Should Be Waived, to the Extent Applicable.**

68.     Pursuant to Bankruptcy Rule 6004(g), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for ten days after entry of the order.  Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of executory contracts or unexpired leases are automatically stayed for ten days after entry of the order.

69.     To preserve and maximize the value of the James Campbell Assets for the benefit of all creditors, and to unburden the bankruptcy estates with respect to the expenses of operating the James Campbell business, the Debtors seek to close the proposed Sale transaction immediately after all closing conditions have been met or waived.  Thus, waiver of any applicable stays afforded by the Bankruptcy Rules is appropriate under the facts and circumstances of these Cases.

---

[10]  The foregoing parties also will be served with a notice of this Motion upon filing.  That will provide additional time for such parties to review and respond to the relief requested.

## NOTICE

70.     Notice of this Motion will be provided to: (a) taxing authorities or recording offices which have a reasonably known interest in the relief requested; (b) counsel for the OUST; (c) counsel to Salus; (d) counsel to the Creditors' Committee; (e) federal, state, and local regulatory authorities with jurisdiction over the Debtors; (f) the Office of the United States Attorney for the District of Delaware, the United States Securities and Exchange Commission, and the Internal Revenue Service; (g) insurers; (h) contract counterparties with respect to the Assigned Contracts; (i) parties known to have expressed an interest in the James Campbell Assets or to have executed confidentiality agreements in connection therewith; (j) the Maverick Parties or their known counsel with respect to these matters; (k) known creditors; and (l) parties requesting notice under Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary or required.

## NO PRIOR REQUEST

71.     No prior motion for the relief requested herein has been made to this or any other Court.

WHEREFORE, for the foregoing reasons, the Debtors respectfully request entry of: (A) an order substantially in the form annexed as **Exhibit A** hereto (i) approving the Bid Procedures; (ii) approving the form and manner of notice of the sale of the James Campbell Assets; (iii) approving the form and manner of notice of the proposed assumption and assignment, including cure amounts, of any executory contracts and unexpired leases in connection therewith; (iv) establishing a date for an Auction; (v) establishing a date for the Sale Hearing; and (vi) granting related relief; and (B) an order substantially in the form annexed as **Exhibit E** hereto: (i) approving the Purchase Agreement and the sale of the James Campbell Assets, free and clear of

all Liens (with such Liens attaching to the proceeds of sale as described above); (ii) authorizing the Debtors to assume and assign the Assigned Contracts, as necessary; and (iii) granting related relief.

Dated:  December 23, 2016          **BLANK ROME LLP**
       Wilmington, Delaware

                           */s/ Michael D. DeBaecke*
                           Michael D. DeBaecke (DE No. 3186)
                           Bryan J. Hall (admitted *pro hac vice*)
                           1201 N. Market Street, Suite 800
                           Wilmington, Delaware 19801
                           Telephone:     (302) 425-6400
                           Facsimile:     (302) 425-6464
                           E-mail:        DeBaecke@BlankRome.com
                                             BHall@BlankRome.com

                           Leon R. Barson (admitted *pro hac vice*)
                           One Logan Square
                           130 North 18th Street
                           Philadelphia, Pennsylvania 19103-6998
                           Telephone:     (215) 569-5576
                           Facsimile:     (215) 832-5576
                           E-mail:        LBarson@BlankRome.com

                           *Proposed Counsel to the Debtors and Debtors in Possession*